Francis X. BELLOTTI, Attorney
General of the Commonwealth
of Massachusetts, Petitioner,

v.

UNITED STATES NUCLEAR REGULA-
TORY COMMISSION and United
States of America, Respondents,

Boston Edison Company, Intervenor.

No. 82–1932.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 29, 1983.

Decided Sept. 23, 1983.

Amended Oct. 7, 1983.

Jo Ann Shotwell, Asst. Atty. Gen. of the
Com. of Mass., Boston, Mass., for petition-
er.

Francis X. Bellotti, Atty. Gen. of the
Com. of Mass., Paula W. Gold, Stephen M.
Leonard and James R. Gomes, Asst. Attys.
Gen. of the Com. of Mass., Boston, Mass.,
were on the brief, for petitioner.

G. Paul Bollwerk, III, Atty., N.R.C.,
Washington, D.C., with whom E. Leo Slag-
gie, Acting Sol., Mark E. Chopko and John
F. Klucsik, Attys., N.R.C., Dirk D. Snel and
Nancy B. Firestone, Attys., Dept. of Jus-
tice, Washington, D.C., were on the brief,
for respondents.

Thomas G. Dignan, Jr., Boston, Mass.,
with whom R.K. Gad, III, Boston, Mass.,
were on the brief, for intervenor.

Before WRIGHT and BORK, Circuit
Judges, and MacKINNON, Senior Circuit
Judge.

Opinion for the Court filed by Circuit
Judge BORK.

Dissenting opinion filed by Circuit Judge
J. SKELLY WRIGHT.

BORK, Circuit Judge:

Before us for review is an order of the
Nuclear Regulatory Commission ("NRC"

or "Commission") denying a petition by the Attorney General of the Commonwealth of Massachusetts to intervene in an NRC enforcement proceeding. The proceeding modified Boston Edison Company's license to operate its Pilgrim Nuclear Power Station located in Plymouth, Massachusetts. The Attorney General, Francis X. Bellotti, claims a right of intervention and a hearing under section 189(a) of the Atomic Energy Act, 42 U.S.C. § 2239(a) (1976) (amended by Pub.L. No. 97–415, § 12, 96 Stat. 2067, 2073 (1983)). The crux of the dispute is the Commission's authority under section 189(a) to define the scope of a proceeding. We conclude the Commission has that authority and that, as the proceeding was defined, Bellotti had no right to intervene.

On January 18, 1982, the NRC's Office of Inspection and Enforcement issued to Boston Edison an Order Modifying License related to the Pilgrim station. The Order discussed serious deficiencies in Boston Edison's management of the Pilgrim plant and amended Boston Edison's license to require development of a plan for reappraisal and improvement of management functions. Concurrently, the NRC imposed civil penalties of $550,000 on the utility. Bellotti petitioned to intervene on February 17, 1982, proposing to address himself to the plant's continued operation, the adequacy of Boston Edison's reappraisal plan, the nature of necessary improvements at the plant and the adequacy of Boston Edison's implementation of required changes. Joint Appendix ("J.A.") at 32–33. After five months had passed without a Commission response to the petition, Attorney General Bellotti brought suit in the District Court for the District of Columbia to compel intervention. After the Commission issued its July 30, 1982 Order denying intervention, the suit in district court was voluntarily dismissed and Bellotti petitioned this court to review the Order of July 30.

■ Section 189(a) of the Atomic Energy Act provides:

(1) In any proceeding under this chapter, for the granting, suspending, revoking, or amending of any license or construction permit, or application to transfer control, and in any proceeding for the issuance or modification of rules and reg-

ulations dealing with the activities of licensees, and in any proceeding for the payment of compensation, an award or royalties under sections 2183, 2187, 2236(c) or 2238 of this title, the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding....

42 U.S.C. § 2239(a) (1976) (amended by Pub.L. No. 97–415, § 12, 96 Stat. 2067, 2073 (1983)). Petitioner contends that the statute clearly confers upon him a right of intervention since the section directs the Commission to hear "any person whose interest may be affected by the proceeding." Intervention is a right only of those affected *by the proceeding;* therefore, as the Commission points out, petitioner's conclusion follows only if the statute also entitles petitioner to define the agenda and substance of the proceeding, since, if section 189(a) does not do that, then the proceeding as defined by the Commission does not affect any interest of the petitioner. The first question, then, is whether petitioner or the Commission has authority to define the scope of the proceeding.

We have no doubt that, as a general matter, such authority must reside in the Commission.[1] To read the statute very broadly so that any proceeding necessarily implicates all issues that might be raised concerning the facility in question would deluge the Commission with intervenors and expand many proceedings into virtually interminable, free-ranging investigations. Few formal proceedings would be scheduled, and the Commission's substantive discretion to decide what is important enough to merit examination would be subverted by a procedural provision requiring the Commission to consider any issue any intervenor might raise. Such a reading of the statute is plainly untenable and cannot be what Congress intended.

This conclusion does not end the controversy, however, because petitioner contends, in the alternative, that the Order of January 18, 1982, defined the proceeding in a way which clearly makes the Attorney General, as the legal representative of the people of his commonwealth, a "person

---

**1.** The Commission would have us sustain its position on the basis of *BPI v. Atomic Energy Commission,* 502 F.2d 424, 428 (D.C.Cir.1974), wherein we held it not unreasonable under section 189(a) "for the Commission to require that the prospective intervenor first specify the basis for his request for a hearing." *BPI* provides at best tangential support for the Commission's position and it certainly does not conclude the issue.

whose interest may be affected" and hence entitled to intervention and a hearing. According to petitioner, the NRC's attempt to limit the scope of the proceeding still further—to the question of whether the Order should be sustained—was contrary to the necessary import of the Order. *See* Brief for Petitioner at 17–19. Only at first glance does this seem a closer question than that already addressed. The Order directs Boston Edison to develop a plan for reappraisal and improvement of management functions. Petitioner claims that the content of this plan is necessarily an issue in the proceeding. *Id.* at 8. If that language makes the improvement of management the issue in the proceeding, petitioner is probably a person affected. However, the Commission claims to have defined the proceeding more narrowly. The development of the plan of action, according to the Commission, takes place outside the proceeding, so that the Attorney General would be an affected person only if he opposed issuance of the Order, which he does not.[2]

The Commission's decision to limit the scope of the proceeding was not arbitrary. That decision was made pursuant to a Commission policy "directing agency resources toward the inspection rather than the adjudication process." Brief for Respondents at 29; *see Public Service Company of Indiana,* 11 N.R.C. 438, 441–42 (1980). We have no reason to believe that this allocation of resources is irrational, and the policy through which the Commission has implemented it serves its purpose well. It should be noted that the issues petitioner seeks to litigate as within the scope of the Order—the plant's continued operation, the adequacy of the reappraisal and its implementation, and the nature of necessary improvements at the plant—would result in a hearing virtually as lengthy and wide-ranging as if intervenors were allowed to specify the relevant issues themselves. Petitioner's narrower claim turns out not to be so narrow and would place an unworkable burden on formal proceedings. Though petitioner intends no such result, the rule for which he contends is capable of turning focussed regulatory proceedings into amorphous public extravaganzas. Moreover, if at petitioner's behest we sought to overturn this agency decision on regulatory priorities, it is by no means clear that we would achieve the result petitioner favors. Rather, we would more likely cause the Commission to be more circumspect in its drafting of orders and seek to accomplish some reforms informally. The dissenting opinion complains that such informal negotiations between the Commission staff and licensees are already too common. They would probably become more so if every new safety measure accomplished through license amendment opened the door to a free-wheeling examination of all possible discontents. If so, the net effect would be regulation less visible to the public. Either way, the efficacy of the regulatory process would be lessened.

We are reinforced in this view by an examination of the larger regulatory structure. Petitioner Bellotti is in no sense left without recourse by the NRC's denial of intervention in the Boston Edison proceeding. Commission regulations provide for public petitions to modify a license, which may lead to license modification proceedings if the Commission finds that appropriate. 10 C.F.R. § 2.206 (1983). Moreover, Commission denials to institute proceedings under section 2.206 are subject to judicial review. *Lorion v. NRC,* 712 F.2d 1472, 1478–79 (D.C.Cir.1983), *reh'g denied,* No. 82–1132 (Sept. 22, 1983); *County of Rockland v. NRC,* 709 F.2d 766 (2d Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 485, 78 L.Ed.2d 681 (1983); *Rockford League of Women Voters v. NRC,* 679 F.2d 1218 (7th Cir.1982). The issues petitioner seeks to raise through intervention he may seek to raise by this alternative route. It is true that the Commission need not hold a hearing on the section 2.206 request, *Lorion,* 712 F.2d at 1475, and that the decision whether or not to begin proceedings is reviewable under deferential standards. But, given the fact that members of the public cannot be allowed to litigate before the Commission any and all issues that occur to them without demolishing the regulatory process, it is appropriate that the Commis-

---

**2.** The Order Modifying License provides that the issue at any hearing held pursuant to it shall be "[w]hether, on the basis of the matters set forth in Sections II and III of this Order, this Order should be sustained." J.A. at 13. As respondents interpret it, this language limits possible intervenors to those who think the Order should not be sustained, thereby precluding from intervention persons such as petitioner who do not object to the Order but might seek further corrective measures.

sion be reviewed under an "arbitrary and capricious" standard. That ensures that only serious issues need be addressed.

Contrary to the views expressed in the dissenting opinion, our holding does not destroy the role of section 189(a). Indeed, our view of section 189(a), when coupled with the petition procedures under section 2.206, provides the functional equivalent to the dissent's view of the proper reading of section 189(a). To the degree that there is a difference, it is that our reading provides for more orderly procedures and, perhaps, more rapid implementation of new safeguards. These points may be quickly made.

■■ The Commission's power to define the scope of a proceeding will lead to the denial of intervention only when the Commission amends a license to require additional or better safety measures. Then, one who, like petitioner Bellotti, wishes to litigate the need for still more safety measures, perhaps including the closing of the facility, will be remitted to section 2.206's petition procedures. A petition is not a futile gesture, for the Commission may not deny it arbitrarily. If, on the other hand, the Commission proposes to amend a license to remove a restriction upon the licensee, the scope of the proceeding is defined by that proposal and section 189(a) permits public participation to oppose that relaxation. The upshot is that automatic participation at a hearing may be denied only when the Commission is seeking to make a facility's operation safer. Public participation is automatic with respect to all Commission actions that are potentially harmful to the public health and welfare. Thus, our holding today does not, contrary to the dissent's belief, "end all public participation with respect to nuclear licensing issues of public concern." Dissenting op., at 1385.

Indeed, because it recognizes the need to prevent section 189(a) from producing unstructured and almost interminable hearings on any issue some member of the public may wish to litigate, the dissent introduces procedural limitations that would have much the same effect upon public participation as does our decision. The dissent points out that the Commission has authority to structure and control section 189(a) proceedings. This means that issues some member or representative of the public wishes to litigate may be ruled out. Should such a ruling be appealed, the court would surely apply an "arbitrary and capricious" standard, just as it would if the same person appealed from a denial of a petition under section 2.206. The results for public participation would appear to be quite similar if not the same. The difference would be that one system would delay an ongoing proceeding to impose new safety requirements while the view we espouse would not.

In this case petitioner is not affected by the proceeding as the Commission has limited it, and so he is not entitled to intervene pursuant to section 189(a). Accordingly, the decision under review is

*Affirmed.*

J. SKELLY WRIGHT, Circuit Judge, dissenting:

The Nuclear Regulatory Commission's interpretation of Section 189(a) of the Atomic Energy Act, 42 U.S.C. § 2239(a) (1976) (amended by Pub.L. 97–415, § 12, 96 STAT. 1067, 2073 (1983), codified at 42 U.S.C.A. § 2239(a) (1983 pocket part)), which the majority approves today, embodies a policy on public intervention in nuclear license amendment proceedings so at odds with the purposes of Section 189(a) that I cannot concur. I must instead agree with those members of the Commission who had opposed the adoption of that interpretation and called it a "pell mell retreat from meaningful public inquiry * * * [that] suggests to the * * * outside world that the agency is run by people living in fear of their own citizenry." *Wisconsin Electric Power Co. (Point Beach, Unit 1),* 12 NRC 547, 550 (1980) (dissenting view of Commissioner Bradford with Commissioner Gilinsky concurring).

This case involves the Massachusetts Attorney General's unsuccessful efforts to participate in NRC proceedings concerning a license amendment that had been developed and ordered by NRC's Office of In-

spection and Enforcement. The amendment was a response to severe safety problems uncovered at Boston Edison Company's Pilgrim Nuclear Power Station located in Plymouth, Massachusetts.

The safety problems discovered at the Pilgrim facility were extraordinary. NRC had found that over a period of two and a half years there had been "a series of breakdowns" in a wide variety of management functions relating to the operations of the nuclear facility. Management's ability to control engineering and design review activities, revise operating procedures, conduct facility maintenance activities, notify NRC about safety problems, and conduct onsite safety committee activities, had all deteriorated. Order Modifying License Effective Immediately (January 18, 1982) at 2 (Order), Joint Appendix (JA) 5. In a January 18, 1982 letter to the licensee (Letter) the Director of the Office of Inspection and Enforcement traced the licensee's "series of noncompliances" to "a lack of management attention over a prolonged period," and described the "failures in the management and control of safety-related activities at the Pilgrim facility as very serious matters requiring extraordinary regulatory actions * * *." Letter at 2, JA 15. NRC's Order, issued on the same date, referred to "substantial serious breakdowns in Boston Edison Company's management controls related to the Pilgrim facility." Order at 6, JA 9. Indeed, the safety problems were so severe that NRC, in the words of its staff's attorney, began "one of the most significant enforcement actions ever taken" by it. NRC Staff's Answer Opposing Request for a Hearing by the Attorney General of the Commonwealth of Massachusetts (March 2, 1982) at 1, JA 41. In addition to ordering the license amendment, NRC imposed civil penalties amounting to $550,000, which we are told were the highest such penalties ever levied by the Commission on a nuclear plant licensee for violating NRC regulations. Brief for petitioner at 3.[1] NRC concluded that "[c]ontinued operation of the * * * facility require[d] significant changes in Boston Edison Company's control of licensed activities." It determined that the license amendment it had developed was "required by the public health, safety, and interest, and [,] therefore, should be imposed by an immediately effective order." Order at 6, JA 9.

The license amendment ordered by the Commission included a requirement that the licensee, within 30 days, develop and submit for NRC approval "a comprehensive plan of action," id., in which the licensee would assure NRC that it would review, evaluate, and, as necessary, modify a variety of its procedures and operations relating to design changes, safety, personnel training, and management oversight. The plan would also have to provide for a program to assure the completeness and accuracy of information that had been or would be provided by the licensee to NRC. Moreover, the amendment required the licensee to retain an independent organization, with sufficient authority and freedom to evaluate a number of aspects of the licensee's organization and operation, to assist the licensee in meeting NRC requirements and to initiate, recommend, or provide solutions to problems.

It is clear that NRC's findings with respect to the Pilgrim Nuclear Power Station's operation raise concerns for the health and safety interests of the residents of Massachusetts. To put it mildly, the plant had been operating far below those safety levels that the Commonwealth of

---

1. Some of the specifics from NRC's findings will illustrate the manner in which the facility was being operated. Among other deficiencies, the Order discussed a condition at the facility involving the partial disabling of a system designed to assure automatic closure of certain valves whose "failure to close when required could result in the release of significant amounts of radioactive materials into the environment." Order at 2, JA 5. At least as disturbing was the finding that, after NRC inspectors discovered errors in safety systems, the licensee had reported to the agency that the errors had been corrected, although they had not been. Later, when the licensee documented the errors, it failed either to inform NRC of what it had found or to inform NRC of the fact that the previous statement concerning compliance had been false. Id. at 3–4, JA 6–7.

Massachusetts and its residents had a right to expect. The NRC-ordered license amendment and the plan it requires the licensee to develop are efforts, whether adequate or inadequate, to remedy this situation. Yet NRC has adopted the position that no representative of the residents of Massachusetts has a right to participate in any aspect of the formulation of the licensing amendment or the evaluation of the plan required by the amendment. In its Order Modifying License it offered to provide a hearing to the licensee, if requested, on the issue of whether the Order should be sustained. It offered no hearing to anyone other than the licensee. The licensee did not request a hearing, and the petition for a hearing filed by the Massachusetts Attorney General was denied by the Commission.

Section 189(a) of the Atomic Energy Act is a broadly worded intervention statute that assures that "[i]n any proceeding * * * for the granting, suspending, revoking, or amending of any license * * * the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding." 42 U.S.C. § 2239(a). While it is true that this court has held that Section 189(a) is not "the last word on the subject of intervention" and that it "does not confer the automatic right of intervention upon anyone," *BPI v. AEC,* 502 F.2d 424, 427, 428 (D.C.Cir. 1974), this case presents a very different question from prior cases.

Previous limits on the participation right in Section 189(a) have all involved efforts by the Commission to regulate the orderli-

ness or timing of public participation in its proceedings, and in those contexts this court has emphasized that "an agency 'should be accorded broad discretion in establishing and applying rules for * * * public participation * * *.'" *Cities of Statesville et al. v. AEC,* 441 F.2d 962, 977 (D.C. Cir.1969) (en banc), quoting *Office of Communication of United Church of Christ v. FCC,* 359 F.2d 994, 1005–1006 (D.C.Cir. 1966). While it may be proper to read Section 189(a) flexibly when the Commission is seeking to structure and channel participation, no such deference is owed when the Commission wholly excludes nondiscretionary public participation. None of our prior cases have involved efforts that would end *all* public participation with respect to nuclear licensing issues of public concern.[2] In this case NRC's efforts to structure and characterize its proceedings so as to completely insulate a certain class of licensing decisions from the scrutiny of nondiscretionary participation are all the more shocking in that the insulated class of cases includes cases where NRC has found serious and current public safety problems to exist. The rationale it offers for denying participation is that in its view no public interest in the proceeding exists. But its rationale can only be viewed as a glaring example of placing form before substance.

NRC reached its intervention position in two steps. First, in *Nuclear Engineering Co. (Sheffield, Illinois Low-Level Radioactive Waste Disposal Site),* 7 NRC 737, 743 (1978), the Commission declared that "the test [for standing to intervene] is whether a cognizable interest of the petitioner might

---

**2.** In all prior cases the NRC policies that we upheld envisioned *some* nondiscretionary public participation. Thus in *Cities of Statesville et al. v. AEC,* 441 F.2d 962 (D.C.Cir.1969) *(en banc),* we permitted the Commission to deny participation to a prospective intervenor where his interests were fully represented by other parties; in *Eastern Utilities Comm'n v. AEC,* 424 F.2d 847 (D.C.Cir.1970) *(en banc),* we permitted the Commission to enforce time limitations on the ability to petition for intervention where those limits were reasonable; and in *BPI v. AEC,* 502 F.2d 424 (D.C.Cir.1974), we permitted the Commission to require that prospective intervenors first specify the basis for their

request for a hearing. Even in *Porter County Chapter of Izaak Walton League v. NRC,* 606 F.2d 1363 (D.C.Cir.1979), where we held that NRC was not required to hold hearings on unresolved safety questions relating to a nuclear power plant construction permit, we emphasized that the plant could not begin operation without an operating license and that a hearing would have to be made available prior to issuance of that license and thus prior to any posing of actual "danger to the public health and safety." 606 F.2d at 1369. *See also Seacoast Anti-Pollution League of New Hampshire v. NRC,* 690 F.2d 1025, 1031–1033 (D.C.Cir. 1982).

be adversely affected if the proceeding has one outcome rather than another." In formulating this test the Commission seemed to be doing little more than restating its adoption of traditional standing doctrine and thus its exclusion of those "who seek to do no more than vindicate their own value preferences * * *." 7 NRC at 742, *quoting Sierra Club v. Morton,* 405 U.S. 727, 740, 92 S.Ct. 1361, 1369, 31 L.Ed.2d 636 (1972). The Commission took the more controversial second step in *Public Service Co. of Indiana (Marble Hill Nuclear Generating Station, Units 1 & 2),* 11 NRC 438 (1980), where it allowed itself the power to limit the scope of any license amendment hearing to the narrowest possible question: should the specific amendment formulated and ordered by the Commissioner be sustained or overturned. By equating this power to limit the hearing's scope with the power to limit the scope of the "proceeding" referred to in Section 189(a) and in *Sheffield,* NRC performed a semantic sleight of hand to acquire for itself the power to exclude public intervention. In *Sheffield* it had defined the test for intervention standing in terms of the possible outcome of the proceeding, and it could now limit what would be called a proceeding so that no one but the licensee could be adversely affected by its outcome. It is this power that is at issue today. In the end, it is a power to shield the licensee from public scrutiny, to allow the licensee to effect a cover-up of its operations.

Under the Commission's reasoning, where a licensed and operating plant has been found unsafe, where the Commission has ordered some remedial amendment, and where the licensee has accepted that amendment, there is no public interest in any proceeding. The only "proceeding" is that offered by the Commission, and that proceeding is limited to whether or not the specific amendment offered should be sustained. If there were a chance that the proceeding would overturn the amendment, the public would have standing, since the plant could return to or remain in its pre-amendment unsafe condition. But this is not a possibility unless the licensee seeks a hearing. Unless the licensee protests, any

proceeding, as limited by NRC, could only sustain the amendment and thus technically would not adversely affect the public interest because it would make the public more rather than less secure when compared to the pre-amendment situation. Because no other issue is within the scope set by the Commission, the public is held to have no interest and therefore no right of participation, even though the license amendment was necessitated by severe public safety problems at licensed and operating nuclear facilities. Thus, by the combined action of the Commission and the licensee, the public is excluded from participating in a statutory hearing that Congress provided for the public's protection. No hearing is held, hence the licensee's "coverup."

This result is a denigration of the participatory goals of Section 189(a). In a somewhat different context this court has said that "[b]y requiring a hearing upon request whenever a license is 'grant[ed], suspend[ed], revok[ed], or amend[ed],' Congress apparently contemplated that interested parties would be able to intervene before any significant change in the operation of a nuclear facility." *Sholly v. NRC,* 651 F.2d 780, 791 (D.C.Cir.1980) *(per curiam), vacated and remanded,* —— U.S. ——, 103 S.Ct. 1171, 75 L.Ed.2d 423 (1983). NRC, in effect, argues that its proceedings conformed to this principle in that the relevant significant change is the ordered licensing amendment, which adversely affects only the licensee. But this is narrow formalism.

That the statute assured the public a right to participate in the initial licensing proceedings reflects Congress' recognition of the public's interest in assuring that the initial license protected public health and safety. Presumably NRC believed that public health and safety had been sufficiently protected by that license. If NRC now finds that the operations of the facility have changed in such a significant way that these public interests are no longer sufficiently protected by that license, it is absurd for the Commission to argue that no public interest is involved in the proceedings to remedy the problem. Just as the

public had a vital interest in participating in the process by which the license that would initially protect them was formulated, they have an interest in participating in the process of making the revisions necessary to the protection of their health and safety. That NRC's actions are efforts to make the unsafe facility to some degree safer is no reason to exclude the public and assert that there is no public interest. Although it may be that we should show great deference to NRC's decisions with respect to how meaningful public participation can best be incorporated into its processes, NRC cannot reserve to itself the power to define the meaning of the word "proceedings" so as to eliminate entirely all rights of public participation in a matter whose entire focus is the issue of public safety. "[W]hen Congress creates a procedure that gives the public a role in deciding important questions of public policy, that procedure may not lightly be sidestepped by administrators." *Environmental Defense Fund, Inc. v. Ruckelshaus,* 439 F.2d 584, 594 (D.C.Cir. 1971).

From its beginnings, this nonintervention policy was recognized as an improper effort by NRC to acquire for itself the power to shield from public scrutiny and participation its reactions to nuclear safety problems. As Commissioner Bradford wrote:

The hearing being offered as a matter o[f] right pursuant to *Marble Hill* is a sham. Petitioners are not permitted to contest the issue that concerns them most, namely the sufficiency of the NRC's action as against the claimed need for other remedies. In short, the Commission has constructed a test that grants a meaningful right to a hearing in cases of this sort only to the utility or another party which may assert that the order goes too far. Anyone else seeking to argue the insufficiency of an NRC imposed remedy must prove that the remedy has made the facility less safe than it had been. Thus, the public's opportunity to be heard when dangerous conditions are shown to exist at a plant can be foreclosed by a staff action resulting in a minimal improvement in safety. * * *

*Wisconsin Electric Power Co. (Point Beach, Unit 1), supra,* 12 NRC at 549–550 (dissenting view of Commissioner Bradford with Commissioner Gilinsky concurring).[3]

Underlying the Commission's position seems to be a view that public participation in decisionmaking is an enforcement weapon for the agency to use or not use as it attempts to influence licensee behavior. It thus argues that "by drawing the scope of the enforcement hearings narrowly, * * * [it can] encourag[e] the licensee to consent to, rather than contest, enforcement actions[.]" Brief for respondent at 29. The licensees' incentive to settle is the fear that otherwise they would "risk a hearing on

---

**3.** Commissioner Bradford's reaction to this specific policy mirrors that taken by NRC's own Special Inquiry Group (formed to study NRC's operation in the wake of the Three Mile Island accident) toward NRC's general participation policies. *See* 1 NUCLEAR REGULATORY COMMISSION SPECIAL INQUIRY GROUP, THREE MILE ISLAND: A REPORT TO THE COMMISSIONERS AND TO THE PUBLIC (Rogovin Commission Report) 139 (1980) ("Insofar as the licensing process is supposed to provide a publicly accessible forum for the resolution of all safety issues relevant to the construction and operation of a nuclear plant, it is a sham.").

The Rogovin Commission Report emphasized two factors making public participation a sham. First, most safety issues are resolved during negotiations between NRC staff and the utility, and although these meetings are officially public, "in fact the public and intervenor groups seldom play any meaningful role at this stage of the process." *Id.* This leaves NRC and the licensee as allies at any hearing and would seem to make independent public participation all the more important. Second, the Report found that because of limited funding and expertise intervenors frequently are unable to "effective[ly] challenge on technical safety issues * * * the combined front presented by the NRC staff and the [utility's] experts." *Id.* But the Report nevertheless argued that "intervenors *have* made an important impact on safety in some instances," *id.* at 143 (emphasis in original), and recommended a variety of measures "to involve the public earlier and more effectively in safety issues." *Id.* Ironically, here we are faced with an intervenor who is likely to have access to the necessary funds and expertise to be effective and is nevertheless prevented from participating by the Commission itself.

whether more drastic relief was called for * * *." *Id., quoting Marble Hill, supra,* 11 NRC at 441. But the congressionally bestowed right of the public to participate in the making of enforcement policy is not a tool to be used or traded off by an agency as part of its enforcement discretion. The Commission's position presents the public with an image of behind-the-scenes decisionmaking and licensee-agency collusion. The public might rightly ask why, if a public proceeding might convince the Commission that there is a need for more drastic remedies, a public proceeding is not held. The Commission's position seems to envision no legitimate and independent public interest in participation. In congressional testimony on NRC's intervention policies, Commissioner Bradford painted a picture that I hope is not true. In his view the Commission "seem[ed] to be basing its decisions * * on some hypothetical concept of a vampire intervenor with whose imagined potential transgressions it is obsessed to the point of curtailing all interventions to avoid a few abuses." *NRC Oversight: Limitations on Intervenors in Licensing Proceedings: Hearing Before a Subcommittee of the House Committee on Government Operations,* 96th Cong., 2d Sess. 62 (1980).

Although Congress did not distinguish between different types of public intervenors for purposes of Section 189(a), this case, involving as it does the intervention efforts of the situs state's Attorney General, highlights the deleterious consequences of NRC's efforts to entirely eliminate public participants from this class of cases. The Atomic Energy Act preempts the states' power to protect their citizenry from radiation hazards stemming from nuclear energy generation, *see Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Development Comm'n,* —— U.S. ——, ——, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983), and in light of that preemption, promoting public participation in NRC decisionmaking is all the more important. Section 189(a) can be viewed in these terms: Having denied state governments the power to protect their citizens directly, Congress tempered the exclusivity of NRC's regulatory power with a requirement that NRC allow public participation in decisions. In this way federal administrative regulation of radiation-related safety issues, though exclusive, could be made more accountable to state and local concerns.

That the state has a continuing vital interest in participating in NRC decisions that affect the safety of its residents has been repeatedly emphasized by Congress, which has twice amended the Act to build a scheme of state participation in NRC decisions. For example, Section 274(*l*) was added to the Act in 1959 to require that NRC notify the relevant states of any applications for licenses that would authorize any of those activities placed under exclusive NRC regulatory control. The amendment also specifically granted states a right to participate in those license application proceedings even when the states chose not to take a position for or against the granting of the application. Pub.L. 86–373, § 1, 73 STAT. 688 (codified at 42 U.S.C. § 2021(*l*) (1976)); *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Development Comm'n, supra,* —— U.S. at —— n. 21, 103 S.Ct. at 1725 n. 21 (§ 2021(*l*) creates advisory role for the states respecting activities exclusively within NRC's jurisdiction).

The states' continued interest in Section 189(a) participation was clearly brought home by Congress in a recent amendment to that section. At the Commission's request, Congress relieved the Commission of any obligation to hold a hearing prior to issuing operating license amendments that involve "no significant hazards consideration." But while lifting the hearing requirement, Congress replaced it with a requirement that "[i]n determining * * * whether [an] amendment involves no significant hazards consideration, the Commission shall consult with the State in which the facility involved is located." Act of January 4, 1983, Pub.L. 97–415, § 12(a), 96 STAT. 2073 (codified at 42 U.S.C.A. § 2239(a)(2)(A) (1983 pocket part)).

In light of this, NRC's policy and today's decision supporting it produce a bizarre re-

sult: When NRC feels that a licensing amendment involves "no significant hazards consideration," NRC must nevertheless, on its own initiative and in recognition of the state's important interest in safety, seek out state consultation if it chooses to forego a hearing; but in a large group of cases involving very serious radiation hazards NRC can simply choose to define the scope of the hearing it offers so as to exclude all state and public participation. When Congress relieved NRC of holding prior hearings on license amendments that involved "no significant hazards consideration," its committee "stress[ed] its strong desire to preserve for the public a meaningful right to participate in decisions regarding the commercial use of nuclear power." S.Rep. No. 113, 97th Cong., 1st Sess. 14 (1981). This concern led it to assure some form of state involvement and to retain a requirement that opportunities for hearings be offered later. Less cannot be required of NRC when dealing with amendments raising major safety issues.

The majority offers a number of policy reasons in support of NRC's position, but I find none of them persuasive. First, the majority finds NRC's contention that it may choose to devote its "resources toward the inspection rather than the adjudication process" to be a reasonable one. Majority Opinion (Maj. Op.) at 1382, Second, the majority warns that preventing NRC from limiting the scope of its hearings would turn "focussed regulatory proceedings into amorphous public extravaganzas." *Id.* Third, the majority points out that "Commission regulations [10 C.F.R. § 2.206 (1983)] provide for public petitions to modify a license, which may lead to license modification proceedings if the Commission finds that appropriate." *Id.* The majority thus finds that NRC offers an

alternative means for the state to voice its concerns.

The first contention implicitly treats public participation in NRC decisionmaking as a weapon of agency enforcement. It is not. It is a right granted to the public by Congress to allow the citizenry to protect its interests and to assure that NRC's processes, having been opened to public scrutiny, merit public confidence. The decision to involve the public in NRC's enforcement processes has been made by Congress, and it is not up to NRC to decide that participation is of little relative value.

The second contention, which seems to be a standard "floodgates" argument, ignores the fact that a host of limiting principles would allow the Commission to manage its hearings. This court has long taken the position that "an agency 'should be accorded broad discretion in establishing and applying rules for * * * public participation * * *.'" *Cities of Statesville, supra,* 441 F.2d at 977, *quoting United Church of Christ, supra,* 359 F.2d at 1005–1006, and responsible use of that discretion should make unnecessary the complete exclusion of public participation. NRC need not open a hearing to "a free-wheeling examination of all possible discontents" whenever it seeks a license amendment. *See* Maj. Op. at 1382. Certainly NRC could at least limit the proceedings to examination of those problems that formed the basis of the licensing amendment.[4] Moreover, the Commission is entitled to great freedom in its efforts to structure its proceedings so as to maintain their integrity while assuring meaningful public participation, *but one of its goals must be to assure that there is meaningful public participation.*

The third contention, that 10 C.F.R. § 2.206 (1983) offers a sufficient alternative

---

4. In this case the underlying safety problems were numerous and quite broad, and limiting the scope of a proceeding to an examination of those problems and their remedies would still leave a very involved proceeding. But this is because of the extraordinarily unsafe conditions that were allowed to prevail at the facility. There is no reason to expect that this situation will be typical; but where such an

extreme situation does exist the complexity of the resulting proceeding is understandable and necessary. It makes no sense to deny public participation on the ground that the threats to the public's interest are too numerous and broad. It does make sense to have proceedings whose breadth corresponds to the breadth of the problems they are designed to address.

**1390**

to a state, denigrates the statutory scheme's assurance that there would be public participation in specific proceedings as a matter of right and in order to effectuate a public interest in open decisionmaking. The agency is allowed wide discretion under 10 C.F.R. § 2.206. In effect, it can often choose to isolate its decisions from public input. Contrary to the majority's position, this wide discretion on the issue of whether or not to initiate a public proceeding cannot be considered the equivalent of the discretion to formulate rules at public proceedings effectively to provide the public with meaningful participation. Section 189(a) places a high value on the principle that NRC must at certain times be accessible to public input, whether or not NRC would so choose on its own. The wording of 10 C.F.R. § 2.206 makes clear that it is meant, within certain broad bounds, to allow the Commission to choose when it wants to hear the public and when it does not. These are thus not equivalent provisions. In this case, where the Section 189(a) right should apply, 10 C.F.R. § 2.206 can only be called sufficient if the Commission would indeed be unable otherwise to prevent the "demolishing [of] the regulatory process," Maj. Op. at 1382, by the litigation of "any and all issues," *id.*, that might occur to a prospective intervenor. I am confident of the Commission's ability to prevent this, even if we require meaningful public participation in license amendment proceedings that seek to remedy serious public safety hazards.

I respectfully dissent.